## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:13-CV-00345-D

| | |
|---|---|
| KATHERINE E. RODGERS, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-22, DE-26] pursuant to Fed. R. Civ. P. 12(c). Claimant Katherine E. Rodgers ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her applications for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on September 29, 2010, alleging disability beginning August 2, 2008. (R. 15, 146-52). Her claim was denied initially and upon reconsideration. (R. 15, 74-84, 85-96). A hearing before the Administrative Law Judge McArthur Allen ("ALJ") was held on March 20, 2012, at which Claimant was represented by

counsel and a vocational expert ("VE") appeared and testified. (R. 34-68). On May 4, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 12-29). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 30-33), and submitted additional evidence as part of her request (R. 5, 269-73). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on March 18, 2013. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence

2

and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges that the ALJ erred by (1) failing to give Claimant's Veteran's Affairs ("VA") disability rating substantial weight and (2) failing to mention all of Claimant's global

3

assessment of functioning ("GAF") scores and evaluate those scores as medical opinions. Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") [DE-23] at 13-18.

## IV. FACTUAL HISTORY

### A.    ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 17). Next, the ALJ determined Claimant had the following severe combination of impairments: depression, bipolar disorder, and post-traumatic stress disorder ("PTSD"). *Id.* The ALJ also found Claimant had a nonsevere impairment(s) of gastroesophageal reflux disease ("GERD") and right knee pain. (R. 18). Additionally, the ALJ found that Claimant had non-medically determinable impairments of hip and back pain. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in her activities of daily living, and moderate difficulties in social functioning, concentration, persistence or pace. (R. 19). Further, the ALJ found that Claimant has experienced one to two episodes of decompensation, each of extended duration. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with the following limitations: avoiding hazardous machinery and

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of (continued...)

4

exposure to heights. (R. 20). The ALJ also identified the following non-exertional limitations: Claimant requires simple, routine, and repetitive tasks in a low-production and low-stress environment, no complex decision-making, constant change, or dealing with crisis situations, no contact with the general public and only frequent but not constant contact with coworkers. *Id.* In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 20-23).

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a unit supply specialist and a general office clerk. (R. 24). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 24-25).

## B. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 28 years old and unemployed. (R. 24, 39). Claimant is married and was pregnant at the time of the hearing, with a due date of July 29, 2012. (R. 45, 48). Claimant is a high school graduate who completed two years of college studying computer software applications, in addition to some recent short-term online college classes. (R. 49-50). Claimant was last employed with the MJ Soffee company in a data entry position for approximately two weeks, where her duties included entering paperwork and creating uniforms. (R. 39). Claimant's past work experience also includes positions as a general office clerk,

---

¹(...continued)

walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

Case 5:13-cv-00345-D Document 29 Filed 01/15/15 Page 5 of 22

a test proctor, and a Unit Supply Specialist in the National Guard. (R. 39-41).

Claimant testified that she is unable to work due to panic attacks associated with stress. (R. 39). Claimant last worked in 2010 at MJ Soffee, and testified that the pressure of being rushed to meet deadlines set off her panic attacks. *Id.* During these panic attacks, Claimant would be physically sick and miss work. *Id.* After missing two days of work due to this sickness, Claimant was fired when she tried to return to work. (R. 39, 55). Claimant testified that the stress of trying to work manifested itself as mostly mental problems. (R. 60).

Previously, Claimant was in the National Guard for eight months, training to be a Unit Supply Specialist, but was never deployed or activated. (R. 41, 61). Claimant entered the National Guard in August of 2003 and was injured during basic training in early 2004. (R. 41-42). Prior to this injury, Claimant testified that she had no mental health problems. (R. 41). While Claimant was completing the running portion of her physical training test, her knee blew out and she fell. (R. 43). The drill sergeant told Claimant she needed to get up to pass the test, so Claimant continued even though her knee was injured and she was in pain. *Id.* After the injury, Claimant was on sick call because of her constant knee problems. *Id.* Claimant testified that she was only given over-the-counter medications for her knee. (R. 43-44). Claimant testified that her knee injury led to her mental problems, because when she realized her knee was not getting better, she became depressed and felt like a failure. (R. 44). Ultimately, in February of 2004, Claimant received an honorable medical discharge due to her mental issues about four weeks into basic training. (R. 42-44).

Claimant and her husband live with Claimant's parents, who are responsible for the household expenses. (R. 47-48). Claimant's mother does the shopping for the household. (R. 47). Claimant testified that on a normal day, she stays at home and spends time with her family and pets.

6

(R. 46). Claimant and her family will watch television and do crossword and jigsaw puzzles during the day. (R. 46-47). Claimant testified that she completed a 500-piece puzzle by herself in three days, and completed a 1,000-piece puzzle with her parents and her niece, which took them a week to finish. (R. 47). Claimant testified that she can only stay focused on an activity for a few minutes before she has to switch to something else. (R. 59). Claimant uses Facebook to communicate with her friends and family. (R. 49). Claimant does not go out by herself often, but will sometimes drive approximately 10 minutes to bring her husband lunch. (R. 46-47, 49). Generally, if Claimant goes out, she stays close by her family. (R. 46).

Claimant testified that she currently attends one-on-one counseling sessions at the VA and her last appointment was in December of 2011. (R. 48). Generally, Claimant's counseling sessions last about an hour. (R. 49). Claimant currently takes Zoloft, and before her pregnancy was taking Trileptal, Celexa, and Seroquel. *Id.* Before she became pregnant and changed her medication, Claimant would experience mood swings even while taking her medication. (R. 58). Claimant testified that she would feel a manic attack coming on almost every day, and would have to sit by herself to try and calm down. *Id.* Depending on the severity of the attack, Claimant would have to sit by herself for a few minutes or for hours. (R. 59).

Since leaving the military, Claimant has taken online classes studying information technology and testified that her grade point average was "pretty good." (R. 49-50). Claimant withdrew from her online classes from the University of Phoenix and did not complete them. (R. 50). Claimant has looked into taking computer classes at some local schools in Fayetteville, but believes that her bipolar disorder, PTSD, depression, and panic attacks would prevent her from being a successful full-time student. (R. 50, 54-55). Claimant testified that being around other students and the pace

7

of homework and lectures would set off her panic attacks, and she does not know how long she could manage class before her panic attacks would start. (R. 55).

Claimant testified that she occasionally goes to church, and there are usually more than 50 people in attendance. (R. 50-51). Claimant and her husband go out to eat and go to the movies together, but she stays close to him because of her panic attacks, which are triggered by being out in public. (R. 51, 60). Claimant testified that when she experiences a panic attack, she gets nervous, scared, self-conscious, and defensive, and feels like people are staring at her. (R. 51-52). During a panic attack, Claimant will cover her face and try to hide. (R. 52). When Claimant is out in public, she has to constantly watch her surroundings to make sure no one is looking at her. (R. 61). Claimant has not had any legal problems since she left the military, and has not gotten into any fights or confrontations. (R. 52). Claimant also testified that she has problems with her memory, and forgets dates and appointments. (R. 59). Generally, Claimant's mother has to remind her of appointments. *Id.* Claimant believes that she struggles with day-to-day life more than other people, and experiences stress from losing focus and not being able to complete tasks. (R. 60).

Claimant testified that her knee injury has led to pain in her ankles, left knee, hips, and back, and that she no longer does any physical training since leaving the military. (R. 52). Claimant's back pain feels like she has pulled muscles, and she has trouble if she sits down for too long and while walking. *Id.* Claimant is only able to stand or walk for a few minutes before she has to sit down due to sharp pain in her knees, ankles, and back. (R. 58). On an average day before she became pregnant, Claimant testified that she spent three hours laying down and sleeping during the day because of her pain. *Id.* Claimant has never injured her back directly, has not had back surgery, and believes she had x-rays taken of her back in the past. (R. 53). Claimant's doctors have not

8

recommended any exercise or stretching programs. *Id.* Claimant testified that she also has sharp pain in her hip, which occurred before she became pregnant. *Id.* Claimant did not have surgery on her knee when she was in the military, and currently the VA is not treating her knee. *Id.* Additionally, the VA is not currently treating Claimant's ankle, hips, or back. (R. 54).

Claimant has a 50 percent disability rating from the VA for her bipolar disorder, which is currently under appeal. *Id.* After Claimant was fired from MJ Soffe, she was hospitalized at the VA due to threats of self-harm and suicide and severe manic attacks and depression. (R. 55). Claimant testified that attempting self-harm has been an ongoing issue for her, and from 2005 forward she has cut herself, burned herself, abused alcohol and drugs, and tried to commit suicide. (R. 56). Currently, Claimant is managing her suicidal thoughts and thoughts of self-harm by talking to her family, and she is not having these thoughts very often since she has been pregnant. (R. 56-57). Before her pregnancy, Claimant had these harmful thoughts almost every day. (R. 57). Claimant has scars from where she has cut and burned herself, and has over 40 tattoos that cover these scars. *Id.* Claimant got her first tattoo when she was 21, and her last tattoo in 2011. (R. 61).

## C. Vocational Expert's Testimony at the Administrative Hearing

Coretta K. Harrelson testified as a VE at the administrative hearing. (R. 61-66). After the VE's testimony regarding Claimant's past work experience (R. 62), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed three hypothetical questions. First, the ALJ asked whether the individual could perform Claimant's past relevant work assuming the individual has the physical capacity to perform light work with no exposure to hazardous machinery or heights and the following limitations: simple, routine, repetitive tasks, low-production, low-stress environment, and no complex decision-making,

9

constant change, or dealing with crisis situations. (R. 62). The VE responded in the negative, but stated that such a hypothetical individual could work as a ticketer (DOT # 229.587-018, light, SVP-2), a returned case inspector (DOT # 929.687-038, light, SVP-2), or a merchandise price marker (DOT # 209.587-034, light, SVP-2). (R. 63).

In the second hypothetical, the ALJ further limited the same individual to no contact with the general public and frequent, but not constant contact with coworkers, and asked whether this would change the VE's earlier response. *Id.* The VE responded that it would not. *Id.* And finally, the ALJ asked whether the VE's answer would change if the same individual would have to miss four or more days of work each month. (R. 63-64). The VE responded that an individual needing to miss that many days of work could not maintain full-time employment. (R. 64).

Claimant's attorney modified the second hypothetical to occasional contact with coworkers and supervisors and asked whether this limitation would eliminate the identified positions. *Id.* The VE responded that this limitation would eliminate work, as those position, along with unskilled jobs generally, involve frequent proximity to coworkers and at least some contact with supervisors. (R. 64-65). Claimant's attorney then modified the first hypothetical to an individual who is unable to main concentration and attention to tasks in one-hour segments, and the VE responded that this limitation would eliminate work as an individual would have to be able to maintain attention and concentration for simple tasks for a minimum of two hours. (R. 65). Claimant's attorney again modified the first hypothetical to an individual who needed to alternate between sitting and standing at will, on average every 30 minutes, and the VE responded that generally individuals performing light jobs are unable to choose how the work is performed. *Id.* The three identified positions allow some flexibility in alternating between sitting and standing, but the VE could not guarantee whether

10

this would be allowed. *Id.* Finally, Claimant's attorney modified the first hypothetical by adding that the individual would need to take unscheduled breaks due to panic attacks and separate herself from others for 30 minutes to an hour. *Id.* The VE responded that such an individual would not be able to maintain full-time employment, as those breaks would be considered excessive absences from work activities. (R. 66).

## V. DISCUSSION

### A.    The ALJ's Consideration of Claimant's VA Disability Rating

Claimant contends that the ALJ erred by giving Claimant's VA disability rating little weight, instead of substantial weight as required by the Fourth Circuit in *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012). Pl.'s Mem. at 13-16. Defendant responds that the ALJ properly considered the VA rating, the instant case is distinguishable from *Bird*, and Claimant has failed to allege that she suffered harm from the ALJ's assessment of the VA disability rating. Def.'s Mem. Supp. Def's Mot. J. Pleadings ("Def's Mem.") [DE-27] at 9-14.

Disability decisions made by other governmental agencies are not binding on the Commissioner, but such decisions "cannot be ignored and must be considered" in making a disability determination. S.S.R. 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006). In *Bird*, the Fourth Circuit noted that "both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Bird,* 699 F.3d at 343 (citation omitted). "Thus, . . . in making a disability determination, the SSA must give substantial weight to a VA disability rating" unless the record clearly demonstrates that lesser weight is appropriate. *Id.* In certain cases, lesser weight may be appropriate due to the different standards employed by the agencies in evaluating a claimant's disability. *Id.* ("[B]ecause the SSA employs

11

its own standards for evaluating a claimant's alleged disability . . . an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate."). The claimant in *Bird* was a veteran who suffered from PTSD and applied for DIB, but did not have any medical records that pre-dated his date last insured ("DLI") of March 31, 2005. *Id.* at 339. The *Bird* claimant had received a 100 percent disability rating for his PTSD from the VA, and the VA disability rating decision summarized psychological evaluations performed by the VA in 2006 and 2007. *Id.* The VA disability rating decision became effective as of the date the *Bird* claimant applied for VA benefits, June 9, 2006, after the date of the *Bird* claimant's DLI. *Id.* The ALJ in that case determined that the *Bird* claimant was not disabled, relying on the lack of pre-DLI medical evidence and the fact that the effective date for the VA disability rating decision post-dated Bird's DLI. *Id.* at 340. Ultimately, the Fourth Circuit held that the ALJ erred by failing to appropriately weigh the VA disability rating decision simply because it became effective after the claimant's DLI. *Id.* at 343-44.

Remand is appropriate when an ALJ fails to adhere to *Bird*'s directive to give substantial weight to a VA disability rating decision unless the record demonstrates that lesser weight is warranted. *Williams v. Colvin*, No. 5:13-CV-571-FL, 2015 WL 73954, at *3 (E.D.N.C. Jan. 6, 2015) (unpublished) (adopting memorandum and recommendation recommending remand where the ALJ gave little weight to the VA disability rating after making a conclusory finding that the VA's disability rating decision did not explain the factors and evidence considered in reaching that decision). Both *Bird* and *Williams* discussed the ALJ's treatment of the actual VA disability rating decision, which is similar to an ALJ's decision in a Social Security proceeding, as opposed to the VA's numerical rating standing alone. *Bird*, 699 F.3d at 343-44 (discussing the ALJ's treatment of

12

claimant's VA disability rating decision); *Williams*, 2015 WL 73954, at *3 (same). The instant case, however, does not actually present a *Bird* issue, as the VA disability rating decision is not contained in the record. Here, Claimant testified that she had a 50 percent VA disability rating for her bipolar disorder. (R. 54). The record also contains Claimant's treatment records from the VA hospital, dating from November 2009 until January 2012. (R. 317-542). These records contain passing references to Claimant's numerical VA disability rating, but fail to include the VA's decision explaining the rationale behind Claimant's award of benefits. (R. 317) (describing Claimant's eligibility as "service connected 50% to 100%"); (R. 452, 468, 487, 529) (describing Claimant's eligibility as "service connected 50% to 100%" and specifically "service connected % - 50"); (R. 427-28, 430-31, 511-12, 514) (listing Claimant's "Rated Disabilities: Bipolar Disorder (50%)"). Further, it is unclear when Claimant was awarded VA disability benefits and whether her disability rating for bipolar disorder has changed over time. And while the record includes Claimant's medical records from the VA, it appears that these medical records are not the same records underlying the VA's disability rating decision, as the records reference Claimant's VA disability rating.

Similarly, remand is appropriate where anALJ fails to perform the *Bird* analysis, even though the ALJ's decision pre-dated the Fourth Circuit's opinion in *Bird*. *Wyche v. Colvin*, No. 4:13cv43, 2014 WL 1903106, at *10-12 (E.D. Va. Apr. 29, 2014) (unpublished). At the time of the administrative hearing in *Wyche*, the claimant "had been awarded a 70% disability rating and 'individual unemployability from the VA as a result of his PTSD.'" *Id.* at *7. However, "the ALJ received very little evidence to establish a basis for the VA's decision." *Id.* The *Wyche* claimant submitted a letter to the ALJ describing his 70 percent disability rating from the VA due to his PTSD, but the record did not contain the VA's actual disability rating decision. *Id.* Further, "the

13

letter include[d] no discussion of the medical evidence supporting the VA's decision, or the rationale supporting either the percentage of disability or the award of benefits." *Id.* The *Wyche* claimant also testified to his disability rating, and that he expected his disability rating to be increased to 100 percent. *Id.* The ALJ found that the *Wyche* claimant was not disabled, and awarded the VA disability rating little weight, stating that the VA standards were not directly comparable to the SSA standards and were not binding. *Id.* at *7-8.

The *Wyche* claimant, however, submitted new evidence regarding his VA disability rating to the Appeals Council after the original hearing decision. *Id.* at *10. This new evidence included "a two-page explanation of the medical evidence and reasons underlying Wyche's VA rating," which at that point had been increased to 100 percent. *Id.* Further, the Appeals Council expressly stated that it considered the new evidence, but found that the new evidence did not provide a basis to change the ALJ's decision and denied review in a decision that post-dated the Fourth Circuit's decision in *Bird*. *Id.* The court in *Wyche* explained that it was required to consider the new evidence in evaluating the ALJ's opinion, because the Appeals Council had received the new evidence as part of the administrative record. *Id.* (citing *Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991), *superseded on other grounds*, 20 C.F.R. § 404.1527)). Further, the court explained that while "the Appeals Council is not required to provide detailed analysis of its conclusion on post-hearing evidence" when denying requests for review, remand may be required "when the new evidence submitted is not explained and its effect on the record as a whole prevents the reviewing court from concluding that the ALJ's decision was supported by substantial evidence." *Id.* at *11 (citing *Meyer v. Astrue*, 662 F. 3d 700, 706 (4th Cir. 2011)). Ultimately, the court concluded that the record did not permit it to "conclude what weight, if any, was given to Wyche's

14

VA rating of 100% disabled" and remanded the case. *Id.* at *11-12.

*Wyche* is distinguishable from the instant case. While the ALJ in *Wyche* only had a letter describing the claimant's numerical VA disability rating and the claimant's testimony about his VA disability rating in the record, post-hearing evidence was submitted to the Appeals Council that included an "explanation of the medical evidence and reasons underlying Wyche's VA rating." *Id.* at *7, 10. Here, however, the record does not contain such a detailed explanation of Claimant's VA disability rating. As discussed above, the only references to Claimant's disability rating are her own testimony at the administrative hearing and passing statements to the numerical rating in Claimant's VA medical records. While Claimant did submit new evidence to the Appeals Council (R. 5), the new evidence consists of a legal brief in support of Claimant's request for review, and fails to mention Claimant's VA disability rating or provide any explanation of the medical evidence and reasons underlying that rating. (R. 269-73).

A claimant seeking DIB has the burden of furnishing medical and other evidence at steps one through four. *Cox v. Astrue*, No. 5:11-CV-527-D, 2013 WL 363755, at *2 (E.D.N.C. Jan. 30, 2013) (unpublished) (holding the ALJ did not err in failing to consider an alleged state disability determination where the claimant produced no evidence of the alleged disability determination) (citing 20 C.F.R. § 404.1512(a); *Pass*, 65 F.3d at 1203)). Given the lack of evidence of record pertaining to Claimant's VA disability rating and the medical evidence and rationale underlying that rating, the undersigned determines that the ALJ did not err by according little weight to Claimant's numerical VA disability rating.

Further, even if Claimant now tried to introduce her VA disability rating decision, it would not warrant remand. Remand is allowed "only upon a showing that there is new evidence which is

material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Accordingly, a claimant has the burden of showing that evidence is "(1) new, (2) material, and (3) previously omitted for good cause." *Cox*, 2013 WL 363755, at \*2-3 (determining that remand was not warranted where claimant had not submitted new evidence, there was no basis to conclude that the disability award determination was material, and claimant failed to show good cause by offering no explanation as to why the evidence was not submitted at the administrative level) (citing *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996)). "[E]vidence is material if there is a reasonable possibility that it would have changed the outcome of the disability determination." *Id.* at \*3 (citing *Wilkins*, 953 F.2d at 96). And "good cause requires a good explanation for the failure to submit the evidence earlier." *Id.* Here, given *Bird*'s directive to award substantial weight to a VA disability rating decision unless the record shows that less weight is warranted, Claimant's VA disability rating decision may be material evidence. Even so, Claimant has not moved to admit the VA disability rating decision or provided it to the court at any stage of the proceedings and offers no explanation for why that decision was not made a part of the administrative record below. Accordingly, the undersigned determines that Claimant has failed to meet her burden of showing that there is new evidence and failed to show good cause for not producing the VA disability rating decision in the administrative proceedings.

Finally, the ALJ has a responsibility to "explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). When a claimant is represented by counsel, however, the ALJ is "allowed to

16

presume that [Claimant] presented his best case." *Schaller v. Colvin*, No. 5:13-CV-334-D, 2014 WL 4537184, at \*9 (E.D.N.C. Sept. 11, 2014) (unpublished) (adopting memorandum and recommendation holding that the ALJ properly weighed a treating physician's opinion and did not err in failing to seek a medical source statement when there was no evidence that such a statement would have changed the outcome of the case); *see Aytch v. Astrue*, 686 F. Supp. 2d 590, 599 (E.D.N.C. 2010) ("[W]hen an applicant for social security benefits is represented by counsel the [ALJ] is entitled to assume that the applicant is making his strongest case for benefits.") (quoting *Johnson v. Chater*, 969 F. Supp. 493, 509 (N.D. Ill. 1997)). An ALJ's failure to fully develop the record only warrants remand when the "failure is prejudicial to the claimant," *Marsh*, 632 F.2d at 300 (citations omitted), and a claimant must show that "she could and would have adduced evidence that might have altered the result." *Schaller*, 2014 WL 4537184, at \*8 (quotations and citations omitted).

Even assuming *arguendo* that the ALJ failed to develop the record here, Claimant has offered no explanation for why the VA disability rating decision was not included in the record, and does not allege how the VA disability rating decision might have changed the outcome of the case. Claimant simply states that had the ALJ considered the VA disability rating and given it substantial weight, he would have considered what a 50 percent disability rating for bipolar disorder means, citing to the C.F.R. section setting forth the schedule for rating mental disorders. Pl.'s Mem. at 15 (citing 38 C.F.R. § 4.130)). Claimant makes no argument as to how this consideration would have changed the ALJ's ultimate conclusion that Claimant is not disabled, given the ALJ's consideration of Claimant's mental impairments, including her bipolar disorder and related limitations in the RFC (R. 20-23). Accordingly, the undersigned determines that remand is not warranted here.

17

## B. The ALJ's Evaluation of Claimant's GAF Scores

Claimant contends that the ALJ erred by failing to discuss all of Claimant's GAF scores and by failing to evaluate the GAF scores as medical opinions pursuant to 20 C.F.R. § 404.1527(c) as directed by Administrative Message AM-13066 (July 22, 2013). Pl.'s Mem. at 16-18. Defendant responds that the ALJ properly considered evidence of Claimant's mental impairments, including her GAF scores, and while the ALJ did not specifically mention each GAF score, he thoroughly discussed the treatment records that accompanied Claimant's GAF scores. Def.'s Mem. at 14-17. Finally, Defendant argues that the administrative message cited by Claimant is an internal guidance tool that is not legally binding on the ALJ or this court. *Id.* at 16.

The Administrative Message cited by Claimant is not publicly available, and appears to be an internal guidance tool promulgated by the Social Security Administration ("SSA"). Such internal guidance tools lack "the force of law" and are not "binding and a source of remedy." *Melvin v. Astrue*, 602 F. Supp. 2d 694, 704 (E.D.N.C. 2009) (holding that the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX") does not have the force of law and rejecting claimant's argument that the ALJ failed to comply with portions of HALLEX); *see also Stroup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003) (holding that the SSA's Program Operations Manual System ("POMS") does not have the force of law); *Pass*, 65 F.3d at 1204 n.3 ("Social Security Rulings are interpretations by the [SSA] of the Social Security Act. While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law.") (citation omitted).

The SSA has stated that GAF scores "[do] not have a direct correlation to the severity requirements in [the social security] mental disorders listings." *Wiggins v. Astrue*, No. 5:11-CV-85-

18

FL, 2012 WL 1016096, at *8 (E.D.N.C. Feb. 2, 2012) (unpublished) (quotations and citations omitted) (memorandum and recommendation holding that the ALJ properly evaluated a claimant's bipolar disorder and mental retardation, even though he did not explicitly mention each individual GAF score in the record), *adopted by* 2012 WL 1016055 (E.D.N.C. Mar. 22, 2012); *see also* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000). Further, the GAF scale was dropped from the DSM-V due, in part, to its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) . . ." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013). Even so, the ALJ must consider a claimant's GAF score along with all of the record evidence.[2] *Atkinson v. Astrue*, No. 5:10-CV-298-FL, 2011 WL 3664346, at *11 (E.D.N.C. July 20, 2011) (unpublished) (quotations and citations omitted), *adopted by* 2011 WL 3664858 (E.D.N.C. Aug. 18, 2011). "However, the failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability determination." *Wiggins*, 2012 WL 1016096, at *8 (quotations and citations omitted).

Here, the ALJ properly considered the Claimant's GAF scores along with all of the record evidence. (R. 21-23). While the ALJ did not mention every GAF score contained in the record, "it is evident that he thoroughly evaluated the treatment records" during the time period in question.

---

[2] This directive is also consistent with AM-13066, as the SSA stated that in the Administrative Message that:

> a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

*Nienaber v. Colvin*, No. C13-1216-RSM, 2014 WL 910203, at *4 (W.D. Wash. Mar. 7, 2014) (unpublished) (quoting AM-13066).

*Wiggins*, 2012 WL 1016096, at \*9. The ALJ in many instances discusses Claimant's GAF scores and what those scores indicate, in addition to discussing more specific information from Claimant's treatment notes. *See* (R. 21-22) (discussing Claimant's hospitalization in April 2010 and noting that Claimant had GAF scores of 40 when admitted and 70 when discharged, and noting that "the claimant responded well to medication and treatment" and at discharge had "no suicidal or homicidal ideation; no delusions or hallucinations; presented with a stable mood; and reported that school and apartment upkeep were stressful"); (R. 22) (noting that after Claimant was discharged from she hospital she attended individual and group therapy, had GAF scores of 58-59 and during this time period "den[ied] urges to cut or harm herself," reported feeling "under [a] lot of stress and a high level of anxiety," reported "'doing good,' no blackouts since December 2009, no voices, no commands, and not suicidal," "feeling chronically anxious with trouble concentrating" but "denied any recent cutting and suicidal and homicidal ideations," and reported "caring for her family's house while her parents were out of town and baking a 3-layer cake for Mother's Day.").

The ALJ went on to summarize the medical records and treatment notes from 2011 and 2012, but did not cite to specific GAF scores from this time period. However, the ALJ noted that Claimant was improving during this time period as she "denied suicidal and homicidal ideations; denied self-mutilations; and was planning to move" out-of-state with her boyfriend, "her mental condition stabilized with medication and decreased stress levels," and "reported increased irritability but no other manic symptoms and denied any increase in depressive symptoms." (R. 22). Additionally, the ALJ considered the disability determination explanation written by Dr. Jennifer Meyer on March 1, 2011. (R. 23, 85-96). Dr. Meyer considered the medical record evidence provided up through that date, including Claimant's psychological treatment notes. (R. 86-96). Dr. Meyer specifically

referenced some of Claimant's GAF scores, in addition to discussing the treatment notes and a third-party function report prepared by Claimant's mother. (R. 89-90). The ALJ afforded great weight to Dr. Meyer's findings, as her opinion "was the product of thorough review of the medical evidence of record and was consistent with the longitudinal medical record." (R. 23).

Further, the ALJ took Claimant's mental limitations into account when determining her RFC, considering both Claimant's testimony as to her mental impairments and the medical record evidence which documented "improvement with medication management and therapy." (R. 23). Ultimately, the ALJ limited Claimant to "work involving simple, routine and repetitive tasks in a low production and low stress environment with no contact with the general public, and only frequent but not constant contact with coworkers, and to occupations that "do not require complex decision making, constant change, or dealing with crisis situations," indicating that the ALJ considered Claimant's mental limitations in formulating her RFC. *Id.* Accordingly, the undersigned determines that the ALJ did not err in evaluating Claimant's GAF scores.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-22] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-26] be ALLOWED, and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected

21

to, and accepted by, the District Court.

Submitted, this the /5 day of January, 2015.

Robert B. Jones, Jr.
United States Magistrate Judge